This case predominantly has to do with the knowingly issue in the alien smuggling statute. This case has to do with the knowingly provision of the alien smuggling statute and that the petitioner did not knowingly assist or aid or abet his brother to enter the United States in violation of the law. Petitioner did not knowingly assist his brother to enter the United States. The facts are essentially not in dispute because they're going based on the immigration judge's recitation of the facts, which is that his brother called him from Nogales, possibly Arizona, stating that he needed $1,200. He didn't know what it was for. He didn't prearrange any smuggling plan. Counsel, before you go any further, can you help me? The first time he testified, he was asked a specific question, and how did he, referring to the brother, get from Nogales to Los Angeles? This is ER 149, and the answer is, we paid a person to cross the border, to cross him across the border and drive him to Los Angeles. That's a pretty damaging admission on the part of your client that he was actively involved in arranging his entry into the United States. What's your answer to that particular piece of evidence? Well, Your Honor, I believe that when they first asked him, he was sort of like, well, my brother told me that the smuggler had paid him. He paid his brother to arrange the plan with the smuggler to get himself into the United States. So he was recitating essentially what happened, not predominantly as to the exact nature of how it happened. I mean, it's sort of like the example of, if I knew you came here in an automobile, I'd be like, you came in a car with an internal combustion engine, but I still wouldn't know what kind of car you came in. It's sort of like, yeah, he just came to the United States because, presumably, like he came to the United States, which was the aid of a smuggler. And then later on, when the judge was like, well, let's go into this further, then he went into the whole fact that, well, no, I really didn't know the smuggler. Well, no, I didn't know how much he was going to charge. I guess the problem I have with your argument, this is really what the immigration judge as the finder of fact is supposed to do. He heard the testimony. He listened to what your client had to say. And after listening to what he said, including the passage I just read to you, he concluded that he had actively participated in aiding and abetting the smuggling entry. And in essence, to give you the relief you're asking for, don't we have to declare that that factual finding is clearly erroneous? That you just can't read that testimony the way that the immigration judge read it? No reasonable fact finder could so conclude? Well, Your Honor, like I said, if you look at the written decision of the immigration judge, she cites the facts that she thought were important in rendering her decision. And in rendering her decision, she went over the fact that he did not know if he was in Nogales, Arizona or Nogales, Mexico. That he did not know originally. When the phone call was made. Yes, when the phone call was made. But that doesn't answer the question that she had to decide, which was whether or not he was actively involved in aiding and abetting the illegal smuggling. Well, as the prior testimony and the later testimony, I believe when she made her written decision, she clearly decided on later testimony. Because she stated that the petitioner did not know where his brother was exactly when he made the phone call. That he did not make any prior arrangements with the smuggler. But that testimony from the first hearing, before he had a chance to realize the ramifications of what he had said the first time he testified, was pretty damaging, don't you agree? I mean, you're asking me to disregard what he said the first time and believe what he said the second time, which was far less inculpatory than it was the first time he testified. Well, I'm asking you to decide on what the immigration judge, the facts that the immigration judge decided on. But I don't decide the facts. What I have to decide is whether or not there is substantial evidence to support the immigration judge's factual determination. And what I need your help in answering is, how can I declare in the face of that kind of testimony that the factual determination is clearly erroneous? Like I said, Your Honor, when he first was just basically asked questions, and he said, oh yeah, it's my brother. And I inadvertently ended up paying the smuggler that ended up helping my brother cross into the United States. Like I said, I do believe there's just like basic preliminary questioning. And like I said, later on, when they went into the heart of the testimony, it sort of came out, how it actually happened. She sort of went to the end result of what happened, as opposed to going through the steps and his subjective intent of what happened, which is what the alien smuggling statute requires. That he knowingly, that he went through every step of the path, that he was practically certain that this outcome would occur, as opposed to just saying, oh yes, at the end, I inadvertently ended up paying my brother smuggler $1,200 to get himself into the United States. You didn't use the, you used the term inadvertently. That's your characterization. He said, we paid a person to cross the border. That's what he said. Assuming that later he found out, oh yes, we ended up paying another person to come in. But like I said, it was a subjective intent. He said, we paid a person, we paid a person to cross the border. Is that what he said? Yeah, originally he said. He said, we paid a person to cross the border. Well, from what we learned, he got the $1,200 from, I think from the family, and went to look for his brother. This coyote spotted him and asked him what his name was. And then he saw the brother in the car. And he gave the brother the money, and the brother paid the coyote. So, we paid a person to cross the border. Well, they did pay a person to cross the border. That's my understanding. That doesn't, you know, it's, his syntax is not too clear. No, like I said, I mean, this is like a translation of somebody who was... I mean, was he an interpreter there? Yeah, he did have an interpreter, but I mean, as far as... I mean, a little bit lost in translation, so to speak. What happened is, his brother told him to meet at the Walmart. And he wasn't searching him out. His brother said, well, meet me at the Walmart for $1,200. And when he went there, a man approached him and said, you know... That's when he approached him, and he's like, well, where's my brother? His thoughts were for his brother. And then his brother came out, and he gave the brother the money. And the brother gave the money to this mother. And it wasn't like, like I said, it wasn't his subjective intent at the time of the hearing. The subjective intent at the time that the whole scheme had all happened at that time. Whether he knowingly assisted his brother into the United States... Would you agree that there was no evidence of any duress? No, like I said, there was a part of the transcript where he said he was in fear... He may have been in fear subjectively. He may have been in fear. He never testified that anybody threatened him or the brother. No, I don't believe he did. He wouldn't have known that since he didn't know the smuggler. He just knew that when his brother called him, that he needed the $1,200. He never said, someone put a gun to my head, or someone put a gun to Louis' head? No, he never said that. And he never said, there's no testimony that the brother said, I'm in danger? No, but he... He may have a subjective fear, but duress requires some objective evidence. There was no objective evidence that either Louis was threatened or that they... I'll just leave it at that. There was no evidence that anybody was threatened. He just said, I need to pay the guy. Can you get me the money? No, I don't believe they actually went over the testimony of when Louis, the brother, called the petitioner on the phone. They never went over... Okay, so that's not in the record. That's not in the record. I don't know if it happened or didn't happen, but it's not in the record. It's not in the record. But like I said, that's not in the record. It's not in the record. Okay. Wasn't there some testimony there about what, you know, heard in the past about what these smugglers do to people that don't come up with the money? Yes, he definitely thought that... When he went there... Yes. When he went there, they had his brother, what, locked in the car. Yeah, his brother was in the car. Was it locked in the car or sitting in the car? It doesn't go over his life or sitting in the car, that he was just in the car. And that he was... Well, the first thing he said was, where's my brother? Not, oh, can I pay you, the smuggler, to complete this transaction? You know what I mean? He was like, where is my brother, is the first thing he said. And he did state later in the transcript that, yes, he knows that... He's very afraid of the stuff that happens and that he crossed, and he knows how dangerous it is to cross. He was subjectively in fear of his brother's health and safety at the time. And didn't the immigration judge say something complimentary about his total honesty? Yes. Like I said, the immigration judge, yes, she stated that he was being honest and that he actively discouraged his brother from coming to the United States. She did state that for the record. And in her written decision, she did say that he was being honest and that he actively discouraged the brother from entering the United States. In the first hearing he went to, he wasn't represented by counsel. At the first hearing he went to, the very, very first hearing, he wasn't. But later on, when they're going through the merits of the suspension and deportation, when this came out, he was represented by counsel. So the testimony that I read from the merits hearing on October 26, 2000, he had a lawyer at that time? Yes, he did have a lawyer at that time. Okay. Thank you. And Lewis is back in Mexico. Yes, Lewis is back in Mexico. May it please the Court, Chris Fuller for the respondent, Attorney General. This case does boil down to substantial evidence in the record whether this alien is described in the alien smuggling provision. You need not prove that he committed a crime. There is no requirement for that. This alien was petitioning and asking for suspension of deportation. Yes, and he met all the requirements except good character. Good character. There's a per se bar in 8 U.S.C. 1101F3. Yes. And this is the old suspension provision that was replaced by cancellation in 1996. It's the old law. Yes. But it's virtually the same as the current law except that the current law makes it a little tougher for aliens to get there. Yes, the old law was the good law. Is that right? The better law. Well, Congress will decide that, not me, Your Honor. Well, I mean, don't you have a mind to think with? Well, my job is here to defend them, Your Honor. Okay. But that old law, seven years of physical presence, good moral character, and then extreme hardship. The question was in the facilities. So the guy is his brother's keeper. That's bad moral character. Ultimately, Your Honor, it's one of those cases that comes up that often happens in both the criminal law and in immigration law. He chose to help his brother and put himself in deportation jeopardy by doing so. Suppose Lewis made it to Los Angeles on his own power, showed up at the house, and he's living there for six weeks, and then the smuggler comes by and says, I need to collect my $1,200. Interesting question would go to whether or not the smuggling activity, the conduct, was complete, absent payment. And I would think that, ultimately, payment is still part and parcel of the smuggling operation itself, and thus lack of payment meant that the process had not yet been completed. I think that would be a different fact scenario, however, but nonetheless the question would be, does the payment, is it part and parcel of the smuggling operation? Would that smuggler go away and say, well, that's just lost money, or would, in fact, the smuggler require payment as part of the deal? But, I mean, is the smuggling over once he's there living in the guy's house? Is the smuggling over? He may have committed some other offense. Maybe he's an accessory or something. But as a legal matter, it would be no different, really, from saying, well, what if he crossed the river and then agreed to pay as opposed to prior to that? Ultimately, it doesn't matter if, in fact, it's part and parcel. We all know that aiding and abetting, for example, one who aids and abets a bank robber does not have to aid and abet the entire activity, from the planning to the casing the joint to obtaining a driver, et cetera. Aiding and abetting can come at any place along the way or at the end. But at some point the bank robbery ends and someone who gives assistance becomes an accessory as opposed to aiding and abetting the crime. That may be true. I'm certainly not a criminal lawyer. What I'm saying is that- Okay. His argument boils down to the smuggling was over by the time he showed up at the Wal-Mart parking lot. So he couldn't have aided and abetted the smuggling. I think his argument goes to the knowing part, to be honest with you, Your Honor, that he didn't know about it because it came at the end. You always have to be honest with us. Right. And the point here is that, interestingly enough, the line that Judge Tolman quoted is not the only time. This alien in that first hearing not once, not twice, but three times admitted to assisting his brother illegally across the border. That happened on page 148 of the record. The question was, and he entered. How did he enter? Answer. He came through Nogales as an illegal like many of us do when we cross the border. Well, did you know he was coming to stay with you? Well, he answered, yes. He told us he was coming and we helped him out paying his crossing. Then the portion- He said he came here illegally. He said that. Yes, indeed, he did that. We helped him out. We paid his crossing. He said he came here illegally. All right. So what's the problem with that? Well, there's nothing wrong if he stood by and watched his brother enter, but he did not stand by and watch his brother enter. He actively participated. Suppose he watched his brother enter and he crosses the border and then gives him a ride to Los Angeles. Is he aiding and abetting? Well, transporting an illegal alien, if you knew he was illegal, that's a separate charge. It's also a separate crime. It sort of complicates the circumstances, but I don't know. Ultimately, remember that this statute is not just aiding and abetting. It's encouraging, assisting, abetting, and aiding. Certainly, in this case, the question was, did he assist? Aiding and abetting is a legal term, and this court has in the past borrowed from the criminal law for that. But the statute also simply says assisting. If he encourages, assists, or abets and aids. Well, you may not know this, but doesn't Section 2 of Title 18 use that language? Aids, abets, assists, counsels, or procures? Well, that I don't know, Your Honor, but I do know that aiding and abetting was a focus of a couple of cases. Judge Fletcher and a couple of others have addressed that in the immigration setting, the phrase aid and abet. This says assist, and it is a term in the immigration law. It's not a criminal term here with regard to the defenses that attach to that. Ultimately, however, he admitted the two times, the one I mentioned, the one Judge Stallman mentioned. A third time, again, in the simple question, asked on page 151 at the bottom, the top of 152, the question was asked, how many times have you helped your brother Louis enter the United States illegally? And he answered, that was the only time. Again, three separate admissions that he assisted his brother to enter illegally, paid this $1,200. He knew what was going on. In fact, in that same hearing, he testified as follows. The question asked, how did he get to Nogales? Did he drive? Did he take a train? What did he do in reference to he being Louis? The answer was, a person that lives here, meaning in Los Angeles, had a station wagon or pickup truck, and he went down there to their home in Mexico, and when he came back, he gave him, Louis, a ride to Nogales. So Louis got a free ride to Nogales, and from there, then had to find a smuggler to take him across the border. He was fully aware of what went on. The elements are there. There's substantial evidence in the record. How do we know what Nogales it was? Well, he himself said that he came through Nogales as an illegal, like many of us do when we cross the border. Well, yeah, but you could come through the Nogales in Arizona. You could. Yeah. You could. And if this court were the trier of fact, you might reach a different reasonable conclusion than did the immigration judge or the board. But this court is not the trier of fact. It is, in fact, looking for substantial evidence in the record, which means more than a scintilla of evidence, but less than proponents. What did the immigration judge say in her written opinion? The written opinion said that it was unclear whether or not, based on the questions and answers and the evidence, whether the phone call came from Nogales, Mexico, or the phone call came from Nogales, Arizona. Yeah. Don't know. Don't know. And hence, it could go either way. She decided, and ultimately the board decided, it didn't matter when, in fact, the telephone call came, because he then assisted the process through his own admissions and through the evidence later that the $1,200 was given directly to the smuggler. And the facts show it. Well, if they're already here and he gave the money to his brother and loaned it to him to pay the smuggler, how does he, just if he had that, how does he assist his brother in crossing illegally? Well, that's an interesting question. If, in fact, this goes to Judge Silverman's question earlier, I think, that if he didn't know anything until his brother shows up at his doorstep and says, I need $1,200 now to pay a smuggler, that's a tougher question. I freely admit that. And I don't know the answer to that one. It's certainly not the facts of this case, because he had foreknowledge. He knew that Lewis was on his way to the United States before he crossed the border. His mother had called. She expressed concern. That was part of it. That was part of the older brother's concern to take care of the younger brother. To tell him that he's on his way to cross the border, or he's already crossed the border. That is not in the record. That's not in the record, so we don't know. We do know that he got a phone call from the mother a day before he got a phone call from Lewis. And based on what he said about getting a ride from their home in Mexico to Nogales, and then crossing, there are reasonable inferences to be drawn that the call was from Nogales, Mexico. But ultimately, as found by the IJ and the board on the facts, it doesn't matter. Because he knew he was coming. He knew that the crossing was occurring. He knew that he was coming illegally. And he promised Lewis on the phone. He told his brother not to come. He did, three to five months before that. But then when his brother did come, he then stepped in to help his brother. When his brother called and said, I'm here in Nogales, and I need $1,200 or whatever. That's right. Yeah, I'm coming here. Yes, and the question is, why did he need that $1,200? In other words, the process had not yet been completed. And he informed his brother and drew his brother in. And his brother, the petitioner here, said, I'll do what I can to get that $1,200. He didn't promise. The record says he didn't promise he would. But he said, I'll do what I can to get it. I will help you, in other words. I will assist you. And when, in fact, he called and said, I'm here. He said, where? Walmart parking lot. He went. And that's at page 186 of the record. He went there, yeah.  I said, yes. He asked me for the money. I told him I had it with me, that I needed to see my brother. When I saw him and my brother got out of the car, I gave the money to my brother. And my brother gave it to the person. And we left. And the process, the crossing, had been completed, consistent with his admission at the very first hearing, consistent with the thing. So ultimately, the question becomes here, is there substantial evidence in the record? And as Judge Tolman suggested, I believe that ultimately, government's position here, that to find compelling evidence that would force you, in essence, to require you to rule against the board and the IG here, you have to disregard three separate admissions that he helped his brother cross illegally. And ultimately, this is a substantial evidence case. It's a favorable review. And to be honest, Your Honors, I think under the circumstances, had any of us been at the trial level, we might have taken the evidence and gone a different way. But the question is, was it a reasonable conclusion, consistent with the facts? And do the facts in the record support that finding? Let me ask you this. When he had the first hearing before the immigration judge, did he waive his right to counsel? No, his counsel was present at the time. At the first hearing? At this hearing we're talking about with the statements made? The first hearing? The very first hearing. I'm sorry. At the very first hearing, he did not have counsel. Yeah. And then he failed to show up, was ordered to be removed in absentia. He moved to reopen with counsel. It was, in fact, reopened. And thereafter, he had counsel. At the very first hearing, he was there, right? He was at his first hearing. Yes. Okay. Did they take a waiver of right to counsel? No. No. In fact, they rescheduled, gave him a chance to have some counsel. He failed to show up. I mean, at that first hearing, he was asked questions. No. He was not. Nothing was said? No. It was basically a master calendar hearing. Who's present? What do you have? Have you filed applications? I think I might have confused the issue here. When I asked the other lawyer about the first hearing, it was the first merits hearing, as I understand it. There were two hearings in which testimony was taken, Your Honor. Let's clarify that. Well, I know. But as I recall, you had a hearing, and you had this immigration judge, the same wonderful woman. And he was asked questions. Yes, that's in October. And he answered them. That's in October of 2000, yes. And he had no lawyer with him. No, he had a lawyer present at that time, yes. And then she continued the matter for him to get a lawyer. No, that's incorrect, Your Honor. Are you sure about that? Yes, I'm positive. Yes. The record shows, by the time there was a merits hearing in which testimony was taken on this issue, it was October of 2000, long after the very first hearing, the master calendar hearing, in which he did not have a lawyer. He did not appear once. He was found deportable in absentia. He got a lawyer, moved to reopen, and it was, in fact, reopened, and the absentia order was removed. And then thereafter, he was represented by counsel throughout, including the October 2000 hearing in which he first stated, yes, I helped my brother and did so three times. He had counsel with him at table during that hearing. And then wasn't it the immigration judge that said, well, let's put this over? Yes. In fact, the judge says, I believe now the problem is there may be a per se bar. And so the judge then put it over, and then a hearing wasn't held for another year and a half in which then they came back and addressed the issue more directly with some specific question and answers that opposing counsel has referred you to. That happened about a year and a half later after. The first hearing that was then continued for a year and a half. Yes. Testimony was taken. Yes. He had counsel present. And he had counsel present. Yes. Did he have the same counsel present at the second hearing? I'm not sure. I think the same law firm represented him. I don't know if the same individual was there. I can't answer that. It would be at the beginning of the hearing. I don't have the full transcript in front of me. But it's my understanding that the same law office represented him throughout the immigration process. A different INS attorney appeared, which is oftentimes the case. The law firm that's here today? That I don't know. The gentleman. That I don't know. So basically what you're saying is I'm looking at AR 155. The first merits hearing on October 26, 2000, when he was represented by a lawyer. The immigration judge, in light of his admission, says at page 155, we now, based on this testimony, we now have a problem here. And the problem is that he may be barred. Yes. Lines 4, 5, and 6. That's correct. He said, I do believe that the respondent is statutorily ineligible to establish good moral character because of having helped his brother enter the United States illegally. And that's where a judge, he praised, if you will, the petitioner for telling the truth. You're one of the few honest people we've had here. Indeed. And she said that, didn't she? Indeed. And that's the irony of the circumstance, that he ends up having to help his brother, who, doubling the irony, nine months later, went back to Mexico. He's totally honest. Well, he's honest to the point that he is telling the truth on the stand. What point was he not honest? Well, with regard to his continuing illegal status in the United States, I have trouble admitting that he's honest with respect to that. But he certainly told the truth on the stand. When he spoke. Yes, when he spoke, he was honest. He spoke honestly. And that's exactly what we rely on, his admission that he helped his brother cross the border. Well, she does say, I think part of the problem is that he, the respondent, is such an honest person that he just volunteered a little too much information. Well, and it's interesting, Judge Fletcher in the Moran decision, which we provided to the court by Rule 28J, a very interesting thing occurred. She wrote the opinion for the panel, and then she wrote a concurring opinion to her own opinion, in which she expressed some disgruntlement with it. The law seems a little harsh in this way. In fact, she used the word unjust. But nonetheless, you're supposed to tell the truth when you raise your arm to the square and testify in immigration court. And he did. That's what he was supposed to do. Unfortunately, Congress says, if you assist, abet, or aid someone to cross the border illegally, you are barred from good moral character. And that's why he was ineligible for suspension of deportation. Have you ever read a transcript where an immigration judge complimented a person? I've read a lot of transcripts, as you have. In your 29 years, Your Honor, I'm sure you've read more than I have. But yes, I've read a couple, but very rare. Very rare, where they compliment them on their honesty. And to be honest, it's ironic, but the law is the law. And he helped. He assisted his brother. Well, it's certainly not the first time in the annals of trial experience that a client volunteered too much on examination and said things that his lawyer wished he hadn't said. Indeed. And if you juxtaposition the two hearings. If you read this, maybe the reason I thought that there wasn't a lawyer, because if he'd had a decent lawyer, you know, he wouldn't have got up there and just rattled off like this. And it's not even clear to me, because you have the interpreter in there. You know, you never know what's coming out on the other end. You know, the interpreter will interpret a question, and he gets an answer, and then he says it in English. You know, it's like a sausage. It goes through. You don't know what you're going to get. One time, I had three interpreters in court. And every time there'd be a question asked and answered, they all have a big argument about it. Indeed. I've had that same experience. Yeah. In this case, there was no complaint about the interpreter. And ultimately, the interesting thing, if you juxtapose these two in terms of finding substantial evidence, the first hearing is an unadulterated, uninterfered with by counsel statement of the truth. The later hearing is, in fact, an attorney-driven interrogation or, excuse me, direct examination in which he was far more careful. Well, it's not that. You know, if you're an attorney, you're not going to put your client on the stand and have them testify without going over this information with them, pointing out what's important, you know, and what isn't important, pointing out the importance of just answering the question that's asked. Indeed. You know. And that's it. So, it seemed to me that whoever was there with him at the first time certainly didn't sit down and prepare him. Well, had he blurted it out once, I would, you might, you might be able to. I wouldn't say coach him, I'm just saying prepare him. Had he only blurted it out once, maybe so, but he said it three times. And the attorney never stopped in between any of those. He was asleep, you know. Could have been. But the record is. He had a lot of turning sleep. Yeah. You know. We've got substantial evidence in the record, Your Honor. And I think in this case, unfortunate though it may be for this individual, the law requires that indeed substantial evidence finds that he assisted his brother in coming across illegally. And hence, the good moral character bar established by Congress applies. In fact, he was not eligible for suspension of deportation. Thank you, Your Honor. Let me say an honest man who testifies honestly and is complimented for it is not a man of good moral character. He does. He did something else besides testify truthfully that made him lack good moral character, Your Honor. I'm going to send that information to Charles Dickens and see what he does with it. Is your firm representing him at that time? Yes. It was our firm who represented him at that time. Were you there? No. I was in law school at that time. It was two prior years. That's no excuse. Good answer. Good answer. Where did you go to law school? University of Illinois.   Champaign. Yes. Well, first of all, the respondent's comment was that he was not eligible for suspension of deportation. The counsel points up to Moran, which was somewhat cut down by another case. Who represented him? Oh, it was another attorney. She's no longer with our firm. And then in the other, she said, well, going back, the immigration judge sort of was unsure of it. Why should we say it over? What was she unsure of? I mean, what she heard was that he admitted facts sufficient to establish the statute. If she was so sure, why did she have the other hearing? It's like, if she was 100% sure that that's what was going on, she could have just stopped it right there and said, that's it. We're done. You're an alien smuggler. Well, what she said is, I'm going to ask that you reset this and go over this and see what you want to do in light of that issue. And I'll enter a decision at the next hearing. But you should come back and be prepared to address Section 101F. Yes. And she still went over testimony because it was unclear to her. I mean, she basically was giving the lawyer one last chance to kind of regroup and see if they could make lemonades out of lemons. But she didn't have to. She could have just said, if she was so sure of it, she could have ended the hearing right there. Well, she could have dropped the hammer on him right then if she'd wanted to. But the way I read it is she was actually bending over backwards to give the lawyer a chance to see if maybe something could be salvaged. Well, like I said, she could have finished the hearing. And if you look at the facts that she uses, it was clearly from the second hearing. Those are the facts that she used to make her decision. How can we – I mean, this is the record. It's the testimony from both hearings that's before us. How can you make that claim that she didn't say, I'm disregarding all the admissions that he made at the first hearing? I don't understand what difference this makes. I mean, if it's in the record at the hearings, it's in the record in the hearings. What's the point of this? She was worried that it came out like with the translation at the time that it was just like, oh, yes. I inadvertently ended up assisting my brother in the United States. Let's hold this over for another hearing and let's just decide it. But another thing, like I said, I know it doesn't matter with the transcript, but just being familiar with the judge, like if she wanted to be certain of it, she definitely would have said it over to be certain of that what actually happened was an alien smuggler or wasn't an alien smuggler as opposed to just taking the first hearing and saying, that's it, we're done. She could have easily said that. And then he didn't understand the question or its implications. Yes, he didn't understand the questions. And then I sort of went over that and why the matter of Jane was important in that case, where you kind of have to go through all the facts, go through all the elements and say, did you do this? Did you do that? Like if you look at the other case, I guess I have to follow up 28-J. She helped the alien or she didn't say anything when the alien was in the trunk and they're going through the border. And this court still said, well, you know what I mean? She didn't really directly assist the alien. In that case, I mean, I'm sure at first the immigration judge probably decided it was an alien smuggler. But when this court finally saw it and said, let's review all the elements, it's still that alien smuggler. And like I said, I still think they're putting the cart before the horse. They're saying, well, you know what I mean? He inadvertently ended up assisting his brother in the United States. But if you look at the elements, if we go through the second hearing, we say, oh, wait a minute. He didn't do this. He didn't do that. He didn't do that. So really, maybe it was an alien smuggler. And that's essentially what we're asking the court to do. And in Altamirano, like I said, when you first look at the facts, you wonder, well, at the preliminary or as a layperson looking at the facts, they think, well, maybe it's alien smuggling. This court also said, well, wait a minute. Once you look at all the facts, maybe it is an alien smuggler. And going back to the hypothetical, he said, well, what if he showed up at his house? Well, what if he showed up at the Walmart versus his house? That's exactly what happened in this case. The alien smuggler did require the petitioner's assistance to enter the United States. He was already in the United States. He really couldn't have helped in any way possible other than just eventually after gathering the money because his brother asked him for the money. And like I said in the prior example, the immigration judge used an aiding and abetting theory. After the completed offense had occurred, as you know, you can't aid and abet once the offense was completed. And he thought, reasonably thought that, well, his brother's calling from Nogales, Arizona. He's probably already in the United States. This is one of those cases where the person's in the desert and they need a ride. And in that case, the ride is essentially the completion of the offense because they're in the desert. The Nogales are already, like in the city in the hard part, was going through a checkpoint, an immigration checkpoint. And in that sense, it was already a complete offense. What's the name of your law firm? Law Office of Enrique Arevalo. Who? Enrique Arevalo, Law Office of Enrique Arevalo. In Pasadena? Yes, in South Pasadena. Your time, you're way over the time. Yeah. Well, you're doing a good job. Is this your first argument? Second. Second, all right. Thank you. And your job is well done, too. Okay, we'll go to number three. Caramani? Yeah.
judges: Pregerson, Silverman, Tallman.